KRETTNICH *v.* DETROIT CHEMICAL WORKS.

MASTER AND SERVANT—PERSONAL INJURIES—DUTY TO INSPECT.
Testimony, in an action for injuries sustained by the breaking of a defective jar holding nitric acid, that defendant made only a visual inspection, that a latent defect existed, which would have been discoverable if defendant had inspected the jar by striking, and that it is necessary to inspect in that way, warranted the submission to the jury of defendant's negligence.

Error to Wayne; Mandell, J. Submitted October 14, 1910. (Docket No. 64.) Decided December 7, 1910.

Case by John Krettnich against the Detroit Chemical Works for personal injuries. Judgment for plaintiff; defendant brings error. Affirmed.

*Willard E. Warner*, for appellant.

*Sloman & Sloman* (*Louis McClear*, of counsel), for appellee.

Blair, J. This is an action to recover damages suffered while moving a nitric acid jar through the escape of nitric acid from another jar, due, as plaintiff's evidence tended to show, to a latent defect in the jar, but, as defendant contended, to a collision between the two jars.

Plaintiff's declaration contains, among other averments, the following:

"That the nitric acid so manufactured by said defendant is a dangerous chemical or article to come in contact with, and, when exposed, gives out noxious and dangerous fumes, and rapidly eats its way into objects that it comes in contact with and renders vessels or receptacles in which it is placed, including crocks or jars, brittle, so that a very slight jar or concussion thereof will cause such crock or jar to break, and release its contents of nitric acid, more especially when such vessel or receptacle is full or nearly full. That, when the acid comes in contact with the body, it burns the flesh and rapidly eats its way therein, all of which facts were then and there well known to said defendant.   *   *   *   That the acid pit, at the time of the committing of the grievances hereinafter mentioned, contained three large, heavy jars or crocks or receptacles used by said defendant for storing nitric acid, and which in height were almost level with the top of said pit and had a capacity of about 250 gallons of nitric acid each, and some of which were at the time aforesaid partially filled and others nearly full thereof, and which while containing acid were kept covered to prevent the noxious fumes from escaping.   *   *   *   That it then and there became and was the duty of said defendant to furnish safe and sound crocks, jars, or receptacles for the storage of nitric acid while the same were in said pit, and to exercise great caution to ascertain whether the same had not become brittle and weakened by reason of the action of the

nitric acid contained therein, and to cause due inspection to be made thereof at reasonable intervals, so that defects and weakness therein due to the action of nitric acid could be discovered and thereby guard against the use of brittle, unsound, or defective crocks, jars, or receptacles of said description. * * * That on the day and year last aforesaid, pursuant to said direction and request, plaintiff entered said pit and proceeded to move one of the crocks, jars, or receptacles therein, which was nearly filled with nitric acid, from one part of said pit to another, and while engaged in so moving the same, without fault or negligence on his part, a crock, jar, or receptacle (which was then and there brittle and defective, but which defects were then and there unknown to plaintiff and were well known to the defendant, or, if not known, should have been, in the exercise of due and proper care on his part) cracked and broke, and a section thereof fell out, and released the contents of nitric acid therein, which ran in and over the said pit, and onto, over, and against said plaintiff," etc.

The important question in the case, and in our opinion the only one requiring consideration, is whether there was any testimony whatever to warrant submitting to the jury whether defendant failed to properly perform its alleged duty of inspection. Three witnesses testified that the jars did not come in contact. No witness testified that they did strike except that the plaintiff, after testifying twice that they did not strike, used the following language:

"*Q.* Just before the jar broke you hollered 'Whoa,' to the men, and they loosened up on the ropes?

"*A.* No; I guess we were moving them at the time they struck—when that piece fell out.

"*Q.* When they struck you said?

"*A.* No; when this piece fell out."

The second witness, Breitenbach, who swore positively that the jars did not strike, had made several statements to defendant's officers prior to the trial to the effect that they did strike. The third witness, Phipps, testified positively that the jars did not strike. Breitenbach and Phipps testified that they examined the jar the second day after

the accident, and the break began about six inches from the bottom and was dark for about six inches from the bottom, and the rest, according to Breitenbach:

"* * * was a clear break. It didn't take much to notice it was a clear break. It was lighter than the other. Lighter the rest of the way around. * * *

"*Q.* What caused the darkness?

"*A.* There is something I don't know. It looked to me like an old break.

"*Q.* What color was it?

"*A.* It was light gray.

"*Q.* What color was the jar?

"*A.* Light, a lightish color.

"*Q.* A light brown?

"*A.* Light brown, you would call it a light brown, a very light brown, more—

"*Q.* If it was dirt from the floor that had spattered around the bottom of the jar, it would make it darker than the clean part?

"*A.* Well, it would not bring it that same color, I don't believe.

"*Q.* It might do it?

"*A.* It might do it, but I don't believe it would. I don't think it would. I am positive it would not."

Phipps testified:

"After the accident, they flushed the pit with water through a hose which was left running, and the pit was cleaned out. After the water was out, I helped to take the crock out. Breitenbach and I broke it up in the pit, and the pieces were thrown through the doorway. I examined the break. Breitenbach called my attention to it. It was rather dark in some places. At the bottom it was darker than at the top, and ran up a foot or eight inches. It looked like a new break on top, but at the bottom it didn't. The discoloration was in the whitish part of the break. It did not run up as far on the north as the south side of the break. It looked like an old break."

The testimony on the part of the defense tended to show that the jars were of the best make known, and that, if in good condition when installed, they would last indefinitely. If the jury believed the testimony of the three witnesses referred to, the jar broke without the

direct application of any outside force and showed an old crack; and from these facts the jury might well have drawn the inference that a latent defect existed in the jar at the time it was installed.

Was it the duty of defendant to inspect, and, if so, was that duty discharged by a visual inspection? Plaintiff's expert Courtiss testified:

"I use earthenware jars and flasks for holding nitric acid. It has some effect upon earthen jars, and gradually decomposes, softens, and weakens them. The purpose of the glazing of the jars is to prevent the acid from going into the jars. If the glaze be broken off, it would naturally go into the jar, it being porous, and decompose the jar.

"Exhibit 7 looks like a piece of earthenware jar. Acid would penetrate it, if it were without the glaze. On the inside either it was just painted, or the glaze has gone away. There are little spots of glazing on it. If nitric acid were stored in it for any length of time, it would gradually decompose the glazing, and take it away. * * * The bottom part of the jar where the acid stays would be most affected.

"Q. Can you tell whether the jar, of which Exhibits 6 and 7 are parts and which you have examined, was well manufactured?

"A. Fairly well, certain impurities in that, indications of impurity, but it is not a perfect jar, the pieces I have seen. Nitric acid weighs about 88 pounds per cubic foot or 7.43 gallons, and 10 to 12 pounds per gallon. The means for testing a jar is by examination of it, and by the ring of it. Every jar that is perfect has a certain ring, a sound ring, by hitting it with a stick or hammer. If there were a crack in the jar, we could not locate it by the ring, unless at the bottom. It might ring on the top, and, if you went to the bottom, it would become dead. You might ascertain a crack. It could be located only in the bottom. Such a test should be made with an empty jar, because the water would deaden the sound. It would be possible to discover it by the ring when empty, but not when full. * * * I have tested jars to see which of two, one full and the other partly full, would break if struck together, and the one partially full would break, because there is not anything behind it to prevent the con-

cussion at the point where it struck. From my experience in handling nitric acid when stored in crocks under the circumstances described, I would think it would be necessary to inspect them. We were instructed to do it."

All of the witnesses testified that there was no patent defect in the jar and defendant's testimony indicates that no inspection except a visual one was ever made. As to why no other than a visual inspection was made defendant's secretary testified:

"If these crocks had not developed a leak within 60 days from the time they were filled, they were good for 25 years."

Defendant's treasurer testified:

"From my experience, I would say that the life of that jar which broke, for the purpose for which it was used, is from 25 to 50 years, in fact, interminable for the storage of nitric acid, with no wearout to it. I do not consider that any further inspection or examination of that jar from the time when it was installed in 1905 was necessary, it having been examined at that time and found in perfect condition. It had not been changed since it was installed."

Whether there was any necessity for other than visual inspection became, under the testimony, a question of fact for the jury, which was properly submitted to them in a very fair and impartial charge which fully guarded the rights of defendant. The verdict was neither against the law nor the evidence, nor can we say that it was so clearly excessive as to justify a reversal.

The judgment is affirmed.

BIRD, C. J., and OSTRANDER, BROOKE, and STONE, JJ., concurred.